**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**

| | |
|---|---|
| In re Harry S. Porterfield,<br><br>Debtor.<br><br>Harry S. Porterfield,<br><br>    Plaintiff,<br><br>    v.<br><br>KeyBank National Association, and Campus Federal Credit Union,<br><br>    Defendants. | Chapter 7 No. 19-00197<br><br><br><br><br><br>Adv. Pro. No. _____ |

**PLAINTIFF'S COMPLAINT**

Plaintiff Harry S. Porterfield files this Complaint against Defendants KeyBank National Association and Campus Federal Credit Union, on personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters, as follows:

**I.**

**PARTIES**

**A.** **Plaintiff**

1. Harry S. Porterfield is a citizen of the State of Iowa, residing in the State of Iowa.

**B.** **Defendant**

2. Keybank National Association (hereinafter "KeyBank") is a bank headquartered in Cleveland, Ohio, and is a subsidiary of KeyCorp. In 2019, Keybank acquired New York based Laurel Road Bank, a student loan lender, and maintains Laurel Road as a brand.

3. Campus Federal Credit Union (hereinafter "CFCU") is a credit union based in Louisiana.

**II.**

## JURISDICTION AND VENUE

4. This Adversary Proceeding is brought under Case Number 19-00197.

5. This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C § 157(b). This is a core proceeding under title 11 because it concerns a determination as to the dischargeability of a debt.

6. This Adversary Proceeding is brought pursuant to 11 U.S.C § 523(a)(8), 15 U.S.C § 1601, 15 U.S.C. § 1692 and Federal Rules of Bankruptcy Procedure Rule 7001.

7. Venue is proper in the Northern District of Iowa pursuant to 28 U.S.C. § 1409 because this matter arises in and is related to a bankruptcy case in this district.

**III.**

## FACTUAL AND PROCEDURAL BACKGROUND

**A.  Background of the Problem**

8. The federal student loan program was originally designed in response to Sputnik. After the successful launch of the Soviet rocket, the U.S. government became worried that the Russians were outpacing Americans in science and math education. In order to make Americans more competitive in the space race, the government authorized the creation of the National Defense Education Act in 1958 and the Guaranteed Student Loan Program (now the Stafford Loan) in 1965.

9. Even by the 1970s, few students needed loans to go to college. The average cost of tuition was only $2,587 and the average debt for a medical student was only $13,469. With Pell grants, scholarships, and summer jobs, even kids from lower-income backgrounds could often make it through college debt free. But largely in response to anecdotal evidence about a few dishonest lawyers filing for bankruptcy immediately after graduation, Congress made student loans presumptively non-dischargeable in bankruptcy for the first five years of

repayment, unless excepting such discharge would impose an "undue hardship" on the debtor or her dependents. Although this rule was at odds with the fundamental purpose of the bankruptcy code, it was perhaps a reasonable exception as it only applied to the first five years of repayment.

10. Congress did not define "undue hardship" in 1978 but instead left that determination to the courts. Over the next thirty years, courts wrestled with meaning of "undue hardship," creating and discarding nearly a dozen tests, working within and without the text of the statute, now commingling the court's equitable powers under section 105 with the court's mandate under section 523(a)(8), now refusing to do so. Over time, two tests have emerged triumphant from the cauldron of judicial lawmaking: the Brunner Test ("Brunner") and the Totality of the Circumstances Test ("TOC"). These two tests are supplemented with wide disagreement over whether courts are permitted to discharge one of several loans, a practice known as "partial discharge."

11. After Brunner and TOC had interpretted the meaning of "undue hardship," Congress amended section 523(a)(8) in two chief ways: (1) abolishing the five year time frame and making student loans non-dischargeable in perpetuity; and (2) adding subsection 523(a)(8)(B) which excepted from discharge qualified private student loans. The problem with these amendments is that the "undue hardship" standards were created when courts were only charged with determining whether repayment of federally insured loans with capped interest rates during the first five years would constitute an undue hardship. Both Brunner and the Totality of the Circumstances test are therefore incredibly harsh because courts knew, when formulating those standards, that after five years the debt could be discharged without any showing of financial strain.

12. When applying TOC, which is binding precedent in this Circuit, Plaintiff humbly prays that this Court reconsider the changing legal landscape of section 523(a)(8) since the time TOC was enacted.

**B.	The Distinction Between Non-Dischargeable And Dischargeable Educational Debt**

13.	Private education loans have limited protection from discharge under section 523(a)(8). Section 523(a)(8)(A)(i) of the Bankruptcy Code excepts from discharge loans "made, insured, or guaranteed by a governmental unit," or those made under a program funded by a governmental unit or nonprofit institution. This section clearly applies to federal loans, and colleges and universities.

14.	Section 523(a)(8)(A)(ii) excepts certain obligations to repay certain funds received as an educational "benefit," plus scholarships or stipends. It does not apply to loans, although creditors have argued that this section does apply to loans, and should be interpreted so broadly as to swallow the entirety of § 523(a)(8).

15.	Section 523(a)(8)(B) of the Bankruptcy Code excepts from discharge a "qualified education loan" as defined in section 221(d)(1) of the Internal Revenue Code.  Section 221(d)(1) defines a "qualified education loan" as any indebtedness incurred solely to pay for "qualified higher education expenses."  "Qualified higher education expenses" are in turn defined in section 221(d)(1) as expenses incurred to cover the "cost of attendance" at a Title IV eligible institution by an "eligible student." A Title IV eligible institution is one recognized by the Department of Education under Title IV of the Higher Education Act.  "Cost of Attendance" is term found in section 472 of the Higher Education Act at 20 U.S.C. § 1087ll, that includes tuition, fees, room, board, books, and living expenses.  An "eligible student" is defined in 20 U.S.C. § 1091 and 34 CFR 668.32 as, *inter alia*, students who have not yet exceeded their annual or aggregate borrowing limits under any program authorized by Title IV of the Higher Education Act. (hereinafter referred to as "Qualified Education Loans").

16.	Consumer loans made to persons to cover expenses at non-eligible institutions or to ineligible students are not Qualified Education Loans.  These educational loans remain dischargeable under the Bankruptcy Code.  Such expenses include: (i) living expenses in excess

of the amount determined necessary by the accredited college or university; (ii) money to pay for bar review classes for recent law school graduates; (iii) money to pay for expenses related to residency for recent medical school graduates; (iv) money to pay for a child's K-12 education; (v) money to pay for unaccredited for-profit schools; and (vi) money lent to ineligible students. The interest on these debts is not tax deductible pursuant to 26 U.S.C. § 221(d), and they are dischargeable in bankruptcy (hereinafter referred to as "Consumer Education Loans").

17. Where confusion exists in determining whether an educational debt is a Qualified Education Loan or a Consumer Education Loan, the Bankruptcy Code places to burden on the creditor to establish by a preponderance of the evidence that the educational debt in question is excepted from discharge.

**C.     Plaintiff's Background and Loan History**

18. Between July 2008 and May 2012, Plaintiff attended Rocky Vista University, College of Osteopathic Medicine, in Parker, Colorado (hereinafter "RVU"). RVU is a for-profit medical school. RVU has the highest rate of graduate debt of all medical schools in this country, at approximately $364,000. Plaintiff was enrolled in the first class of graduating students from RVU.

19. During his attendance at RVU, Plaintiff borrowed from Sallie Mae and Bank of Lake Mills. He refinanced his debt with Darien Rowayton Bank, also known as "DRB" or "DR Bank" in 2015 or 2016. DRB changed its name in 2018 to Laurel Road Bank and was acquired in 2019 by KeyBank. Plaintiff's Debts to KeyBank were being serviced by Mohela at the time of the bankruptcy filing.

20. During his attendance, RVU was not a Title IV institution recognized by the Department of Education under the Higher Education Act. As a result, students at RVU were not eligible to participate in federally subsidized loan programs or to receive federal financial aid,

and the Plaintiff's Debts to KeyBank are not Qualified Education Loans excepted from discharge under § 523(a)(8)(B).

21. The Plaintiff's Debts to KeyBank also are not loans made, insured, or guaranteed by a governmental unit, or obligation to repay funds received as an educational benefit, scholarship, or stipend. Accordingly, the Debts to KeyBank are not excepted from discharge under either subsection of § 523(a)(8)(A).

22. Following his graduation from RVU, Plaintiff obtained a loan from CFCU, for personal use during his post-graduation medical residency. Because this loan is not an educational loan, it is not excepted from discharge under any subsection of § 523(a)(8).

**D.** **Plaintiff Files For Bankruptcy**

23. Plaintiff filed for bankruptcy in this Court on March 1, 2019. He listed on Schedule F of his bankruptcy petition a debt to Mohela/Laurel Road Bank in the amount of $459,146.00, for non-qualified loans. The scheduled monthly payment listed on the credit report is $4,101.00.

24. Plaintiff's Debts to KeyBank now exceed $460,000.00, and bear interest at the annual rate of 6.25%. The Debts accrue interest of approximately $25,000 each year.

25. Plaintiff owes approximately $63,500.00 on his one loan to CFCU, and listed this obligation on his Schedule F as a non-educational line of credit.

26. Plaintiff's disposable income at the time of the bankruptcy filing was negative $5,157.33 per month, which included an estimated payment to KeyBank of $4,000.00.

27. Plaintiff has accepted a position with NIH in Bethesda, MD, beginning July 1, 2019. The position pays $180,000.00 annually, but Plaintiff expects his Debts to KeyBank will continue to impose an undue hardship on him or his dependents.

28. Plaintiff lives with his wife and son. His family, who are dependent upon his income, suffer serious health conditions which render them unable to contribute financially, and which places further financial and emotion burdens on the Plaintiff.

## IV.

## CLAIMS FOR RELIEF

**A.** **Count One: Declaratory Judgment and Determination of Dischargeability**

29. Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

30. Plaintiff's Debts are not excepted under §§ 523(a)(8)(A)(i), 523(a)(8)(A)(ii), or 523(a)(8)(B).

31. Plaintiff requests declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Bankruptcy Procedure 7001(9) that the Debts are to be included in the general discharge entered by this Court.

**B.** **Count Two: Undue Hardship**

32. Plaintiff re-alleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

33. Plaintiff is entitled to discharge of his debt to the Defendants, either in whole or in part, because repayment would constitute an "undue hardship" on him or his dependents.

34. Plaintiff meets the standard for undue hardship as articulated in Totality of the Circumstances test.

35. Accordingly, Plaintiff prays this Court discharge his student debt in part or in total.

V.

# **PRAYER**

36. In light of the foregoing, Plaintiff requests that Defendants be cited to appear and judgment be entered against Defendants for:

(1) declaratory and injunctive relief;

(2) determination of dischargeability;

(3) other such relief as the Court deems just and proper.

Respectfully submitted,

/s/ Steven G. Klesner
Steven G. Klesner AT0004271
Johnston, Stannard, Klesner, Burbidge
& Fitzgerald, P.L.C.
373 Scott Court, Suite B
PO Box 3400
Iowa City, Iowa 52244
(319) 338-9852 Telephone
(319) 354-7265 Facsimile
ATTORNEY FOR DEBTOR/PLAINTIFF